UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JOANNAH DICKINSON,                                      16 CV 1036 (VSB) (KNF)

          *Plaintiff*,

     -against-

CITY UNIVERSITY OF NEW YORK,

          *Defendant.*
-------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SCHWARTZ PERRY & HELLER, LLP**
***Attorneys for Plaintiff***
**295 Madison Avenue**
**New York, New York 10017**
**(212) 889-6565**

**TABLE OF CONTENTS**

**SUBJECT**                                                                          **PAGE**

TABLE OF AUTHORITIES                                                                  iii

PRELIMINARY STATEMENT                                                                 1

STATEMENT OF FACTS

THE REDUCED STANDARD FOR SUMMARY
JUDGMENT IN DISCRIMINATION CASES                                                      2

ARGUMENT

POINT I      DICKINSON ESTABLISHES CLAIMS FOR
             AGE AND GENDER DISCRIMINATION                                            3

      A.     Dickinson Was Denied The Acting Full-Time
             Position Because Of Her Age And Gender                                   4

             1.    Lepera's Comments And Conduct After
                   Kisel Was Hired                                                    4

             2.    Lepera's Calling Kisel "New Blood"
                   Is Direct Evidence Of Discrimination                               6

             3.    CUNY's Efforts To Explain Away Lepera's
                   Discriminatory Conduct Are Unavailing                              8

      B.     Lepera's Subjective Explanation For Choosing Kisel
             Over Dickinson Is A Question of Credibility And
             Cannot Be Resolved On Summary Judgment                                   11

      C.     Dickinson Experienced A Hostile Environment                              15

      D.     CUNY's Ineffective Investigation                                         17

POINT II     DICKINSON ESTABLISHES A CLAIM OF RETALIATION                             18

      A.     Dickinson Establishes A Prima Facie Case                                 19

             1.    Dickinson's Protected Activities
                   Of Which CUNY Was Aware                                            19

             2.    Dickinson's Termination Was
                   Causally Connected To Her Complaints                               19

B.     CUNY's Explanation For Firing Dickinson Is A Pretext        21

C.     CUNY's Distortion Of The Search Committee        23

CONCLUSION        25

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                    <u>**PAGE**</u>

Ames v. Cartier, Inc.,
      193 F.Supp.2d 762 (S.D.N.Y. 2002)                                15

Aulicino v. New York City Dept. of Homeless Servs.,
      580 F.3d 73 (2d Cir. 2009)                                          3

Britt v. Merrill Lynch & Co.,
      2011 U.S. Dist. LEXIS 96881 (S.D.N.Y. Aug. 26, 2011)               21

Byrnie v. Town of Cromwell,
      243 F.3d 93 (2d Cir. 2001)                                          13

Carlton v. Mystic Transp., Inc.,
      202 F.3d 129 (2d Cir. 2000)                                         2, 11

Conklin v. Cty. of Suffolk,
      859 F. Supp. 2d 415 (E.D.N.Y. 2012)                                 20-21

Curley v. St. John's Univ.,
      19 F.Supp.2d 181 (S.D.N.Y. 1998)                                    23

Danzer v. Norden Sys., Inc.,
      151 F.3d 50 (2d Cir. 1998)                                          8, 10

Delville v. Firmenich Inc.,
      920 F. Supp. 2d 446 (S.D.N.Y. 2013)                                 21

El Sayed v. Hilton Hotels Corp.,
      627 F.3d 931 (2d Cir. 2010)                                         21

Fagan v. U.S. Carpet Installation, Inc.,
      770 F. Supp. 2d 490 (E.D.N.Y. 2011)                                 18-19

Feingold v. New York,
      366 F.3d 138 (2d Cir. 2004)                                         9-10, 15

Fincher v. Depository Trust and Clearing Corp.,
      604 F.3d 712 (2d Cir. 2010)                                         2

Gallimore v. City University of New York Bronx Community College,
    641 F.Supp.2d 269 (S.D.N.Y. 2009)           7

Gonzalez v. Police Dept., City of San Jose, Cal.,
    901 F.2d 758 (9th Cir. 1990)           10

Gorman-Bakos v. Cornell Coop. Extension,
    252 F.3d 545 (2d Cir. 2001)           20

Gorzynski v. JetBlue Airways Corp.,
    596 F.3d 93 (2d Cir. 2009)           12, 20

Grant v. Bethelehem Steel Corp.,
    622 F.2d 43 (2d Cir. 1980)           20

Guzman v. News Corp.,
    2013 U.S. Dist. LEXIS 155026 (S.D.N.Y. Oct. 28, 2013)           20

Holcomb v. Iona College,
    521 F.3d 130 (2d Cir. 2008)           10

Ibok v. Securities Indus. Automation Corp.,
    369 Fed. Appx. 210 (2d Cir. 2010)           12

Jute v. Hamilton Sundstrand Corp.,
    420 F.3d 166 (2d Cir. 2005)           19, 20

Kaytor v. Electric Boat Corp.,
    609 F.3d 537 (2d Cir. 2010)           3

Kirsch v. Fleet Street, Ltd.,
    148 F.3d 149 (2d Cir. 1998)           9

Kwan v. Andalex Group, LLC,
    737 F.3d 834 (2d Cir. 2013)           18

Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons,
    999 F. Supp. 506 (S.D.N.Y. 1998)           3

Mace v. Marcus Whitman Cent. Sch. Dist.,
    2015 U.S. Dist. LEXIS 129827 (W.D.N.Y. Sep. 25, 2015)           8

Martinez v. Librera,
    2016 U.S. App. LEXIS 21509 (2d Cir. Dec. 2, 2016)        4

Mate v. New York State Dept. of Transp.,
    24 A.D.3d 330 (1st Dept. 2005)        12-13

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)        18

O'Connor v. Consolidated Coin Caterers Corp.,
    517 U.S. 308 (1996)        11

Oncale v. Sundower Offshore Services,
    523 U.S. 75 (1998)        9

Ostrowski v. Atlantic Mutual Ins.,
    968 F.2d 171 (2d Cir. 1992)        6-7

Papelino v. Yu,
    633 F.3d 81 (2d Cir. 2011)        23

Price Waterhouse v. Hopkins,
    490 U.S. 228, 244-45 (1989)        6

Pucino v. Verizon Communs., Inc.,
    618 F.3d 112 (2d Cir. 2010)        15

Quinn v. Green Tree Credit Corp.,
    159 F.3d 759 (2d Cir. 1998)        12

Redd v. N.Y. State Div. of Parole,
    678 F.3d 166 (2d Cir. 2012)        3, 17

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)        9

Rose v. N.Y. City Bd. of Educ.,
    257 F.3d 156 (2d Cir. 2001)        7, 23

Rosen v. Thornburgh,
    928 F.2d 528 (2d Cir. 1991)        2

Ruhling v. Tribune Co.,
    2007 U.S. Dist. LEXIS 116 (E.D.N.Y. Jan. 3, 2007)       17

Sassaman v. Gamache,
    566 F.3d 307 (2d Cir. 2009)       9

Stampfel v. City of N.Y.,
    2005 U.S. Dist. LEXIS 36371 (S.D.N.Y. Dec. 27, 2005)       8

Summa v. Hofstra Univ.,
    708 F.3d 115 (2d Cir. 2013)       19, 20

Terry v. Ashcroft,
    336 F.3d 128 (2d Cir. 2003)       15

Treglia v. Town of Manlius,
    313 F.3d 713 (2d Cir. 2002)       20

Tyler v. Bethlehem Steel Corp.,
    958 F.2d 1176 (2d Cir. 1992)       7

Vogel v. CA, Inc.,
    662 Fed. Appx. 72 (2d Cir. 2016)       18

Weiss v. JPMorgan Chase & Co.,
    332 Fed. Appx. 659 (2d Cir. 2009)       4-5, 12, 22

Williams v. Quebecor World Infiniti Graphics,
    456 F.Supp.2d 373 (S.D.N.Y. 2007)       22

## PRELIMINARY STATEMENT

On June 25, 2013, Plaintiff Joannah Dickinson ("Dickinson") obtained a position as a Hearing Representative in the Workers Compensation and Unemployment Insurance Unit for Defendant City University of New York ("CUNY").   At that time, Dickinson had 15 years of experience in handling unemployment insurance claims.   While the position was part-time, her supervisor, Ann Lepera ("Lepera"), told her that she would make Dickinson full-time as soon as a position was available.   Such a position would permit Dickinson to have full-time employment, benefits and an opportunity for advancement, while working in a field that she loved but offered few opportunities for employment.

Despite the positive feedback Dickinson received, her employment changed dramatically in October 2013, when Lepera hired Alexander Kisel ("Kisel"), who was in his 20's, to serve as another part-time Hearing Representative. Lepera became infatuated with Kisel's gender and youth, referring to him as "kid," "young kid" "cute kid" and "energetic."   Lepera openly favored Kisel and started excluding Dickinson, who was 49 years old, from meetings.   Lepera's promises to Dickinson of a full-time position evaporated.   In late January 2014, Lepera told Dickinson that she was appointing Kisel to an "acting" full-time position, even though Kisel undeniably did not meet the minimum qualifications for the role.   When Dickinson asked why she appointed Kisel to the acting position, Lepera stated that she wanted "new blood," which was direct confirmation that Kisel's age and gender motivated her decision.

Dickinson complained about discrimination on February 10, 2014, and thereafter spoke to two members of CUNY's Human Resources and also retained an attorney who was in contact with counsel for CUNY.   Almost immediately after Lepera learned about Dickinson's complaint, she began to develop a pretext of poor performance by papering an internal file she created with

self-serving memos. None of the issues contained in these memos were shared with Dickinson at the time they allegedly arose.

Following a perfunctory investigation, CUNY found Dickinson's claim to be "unsubstantiated" in early April 2014. Less than two weeks later, Lepera terminated Dickinson in clear retaliation. Although Dickinson had applied for the permanent full-time role, her termination ended her candidacy. Kisel was named to the position, even though he did not meet the minimum qualifications.

These undeniable facts demonstrate that summary judgment is not appropriate in this case. In fact, CUNY's entire motion boils down to Lepera's self-serving denial, which is not appropriate for summary resolution. CUNY's motion, therefore, should properly be denied.

## THE REDUCED STANDARD FOR SUMMARY JUDGMENT IN DISCRIMINATION CASES

It is not surprising that CUNY denies that it discriminated and retaliated against Dickinson. Courts have repeatedly recognized that "an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000); Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (recognizing that in discrimination cases, "the defendant will rarely admit to having said or done what is alleged, and third-party witnesses are by no means always available.") (citations omitted); Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) (noting that "employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence" and that an employer "is unlikely to leave a 'smoking gun'" of a discriminatory intent).

2

It is also well settled that on this motion, all of Dickinson's facts must be accepted as true and all inferences drawn in her favor.  See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit."); Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) ("Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit").  A court must also use an analysis most favorable to the plaintiff. See Aulicino v. New York City Dept. of Homeless Servs., 580 F.3d 73, 83 (2d Cir. 2009) (reversing summary judgment where the analysis of the lower court "dilute[d]" the strength of the plaintiff's claims and did not "appear to us to consider the record evidence *in the light most favorable to the plaintiff,* as it is required to do.") (emphasis in original).

## ARGUMENT

## POINT I

### DICKINSON ESTABLISHES CLAIMS
### FOR AGE AND GENDER DISCRIMINATION

CUNY does not dispute that Dickinson has established a prima facie case and states that "the Court can proceed directly to the ultimate issue of whether, on the record as a whole, plaintiff can establish issues of fact that would, if resolved in [her] favor, carry [her] ultimate burden."  (CUNY Brief pg. 13 n.3); see, e.g. Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons, 999 F. Supp. 506, 515 (S.D.N.Y. 1998) (Chin, J.) ("The McDonnell-Douglas test has outlived its usefulness. Hence, it should be discarded and courts instead should focus on the 'ultimate issue' – whether the plaintiff has proven that it is more likely than not that the employer's decision was motivated at least in part by an 'impermissible,' or discriminatory, reason.").

3

**A.    Dickinson Was Denied The Acting Full-Time**
**Position Because Of Her Age And Gender**

Looking at the "ultimate issue" in this case, the record clearly demonstrates that Lepera's

discriminatory preference for Kisel based on his gender and significantly younger age caused her to

select him for the full-time role.

   1.    *Lepera's Comments And Conduct After Kisel Was Hired*

As set forth in Dickinson's accompanying Affidavit, after Lepera hired Kisel, who was in his

20s, in October 2013, Lepera was infatuated and enamored with his youth and gender.   Lepera

frequently referred to Kisel as "kid,"  "cute,"  "young" and "energetic," all of which directly relates

to age and gender.   (Dickinson Aff. ¶¶7-8).  Dickinson described a time when she was in Lepera's

office and when Kisel passed by outside, Lepera said, "real cute kid," referring to Kisel, and smiled.

(Dickinson Aff. ¶8).   On another occasion, Lepera said, "God, so cute!" after Kisel walked by, and

she would frequently remark that Kisel was "young and energetic" or "cute" if he was in the vicinity.

(Dickinson Aff. ¶8).   Lepera does not dispute that she referred to Kisel as "cute." (AL 102).

As a matter of law, Lepera's comments that Kisel was "young" and "energetic" sufficiently

indicate a discriminatory bias to withstand summary judgment.  See Martinez v. Librera, 2016 U.S.

App. LEXIS 21509, at *7 (2d Cir. Dec. 2, 2016) (holding that a comment about "mak[ing] room for

the younger generation" was "less a 'stray' remark than an open declaration of bias" that "not only

reflected a highly discriminatory attitude," "referred directly to the particular employee's tenure");

Weiss v. JPMorgan Chase & Co., 332 Fed. Appx. 659, 664-65 (2d Cir. 2009) (reversing summary

judgment where the employer expressed a desire for "energized" employees, holding that

"considering the comment in the context of the other evidence of pretext presented by Weiss, a jury

could conclude that the term 'energized' was a euphemism for youthful.").

Moreover, Lepera's attitude and treatment of Dickinson changed after Kisel was hired, further heightening the inference of discrimination.  Prior to Kisel's arrival, Lepera gave Dickinson positive feedback and told Dickinson that if it were up to her, Lepera would make Dickinson full-time.[1]  (Dickinson Aff. ¶¶4-5).   In fact, Lepera told Dickinson that she was trying to obtain authorization for a full-time person and that if she did, Dickinson would get the job.  (Dickinson Aff. ¶5).  Soon after Kisel was hired, however, Lepera ceased any discussion with Dickinson regarding the full-time position.  (Dickinson Aff. ¶10).   Lepera also started to have frequent closed door meetings with Kisel to which Dickinson was not invited, even though Kisel and Dickinson were doing the same work and sometimes had to cover each other's cases.  (Dickinson Aff. ¶10). Dickinson no longer had an assigned work station, which was humiliating to her.  (Dickinson Aff. ¶30).   Lepera even stopped sharing catalogues from her sister-in-law's jewelry business with Dickinson.  (Dickinson Aff. ¶10).

CUNY completely distorts Dickinson's testimony by claiming that Dickinson "is unwilling to attribute . . . any deeper significance" to Lepera's discriminatory statements.  (CUNY Brief pg. 17).  The deposition pages that CUNY cites relate to CUNY's effort to try to get Dickinson to inject some type of "sexual or romantic" aspect into Lepera's relationship with Kisel, which Dickinson has not and does not assert.  (Exhibit U, pgs. 96-106).

---

[1]  It is undisputed that Lepera "had long sought a full-time Associate Director for the Unit.  (CUNY Brief pg. 5).

5

2. *Lepera's Calling Kisel "New Blood"*
*Is Direct Evidence Of Discrimination*

When Lepera finally obtained approval to hire someone on a full-time basis, she named Kisel to the acting position, not Dickinson. (Dickinson Aff. ¶11). After Lepera told Dickinson she had chosen Kisel, Dickinson said she did not understand what was happening because Lepera had previously promised that any full-time position would be hers, and that Kisel was newer to the role and had less experience than she did. (Dickinson Aff. ¶11). Lepera responded that she wanted Kisel because he represented "new blood," which, based on Lepera's words and actions, clearly meant a young man. (Dickinson Aff. ¶11).

Lepera's comments were not stray remarks, but were directly related to the decision to select Kisel over Dickinson. In fact, Lepera acknowledges that Dickinson had a "considerable edge in experience over Mr. Kisel." (Lepera Decl. ¶2). Lepera's statement that she selected Kisel because he was "new blood" was a clear declaration that Dickinson's age and gender played a role in her decision.

Accordingly, the Court may apply the legal framework established by the United States Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 244-45 (1989), which held that once a plaintiff presents direct evidence of discrimination, "the burden shifts to the defendants to establish that once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role." The Second Circuit clarified this analysis in Ostrowski v. Atlantic Mutual Ins., 968 F.2d 171, 182 (2d Cir. 1992), recognizing:

> In sum, if the plaintiff presents evidence of conduct or statements by
> persons involved in the decisionmaking process that may be viewed

6

> as directly reflecting the alleged discriminatory attitude, and that
> evidence is sufficient to permit the fact-finder to infer that that
> attitude was more likely than not a motivating factor in the
> employer's decision, the jury should be instructed that if it does draw
> that inference, the plaintiff is entitled to recover unless the employer
> has established by a preponderance of the evidence that the employer
> would have taken the same action without consideration of the
> impermissible factor.

This standard does not require a "smoking gun" announcing a discriminatory intent, "for that type of 'direct' evidence as to a mental state is usually impossible to obtain." Ostrowski at 181, citing Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir. 1992) (noting that "'[d]irect evidence,' it seems, is an unfortunate choice of terminology").

This case is similar to Rose v. N.Y. City Bd. of Educ., 257 F.3d 156, 162 (2d Cir. 2001), where the Second Circuit vacated the lower court's grant of judgment as a matter of law where the discriminatory statements "were not the stray remarks of a colleague but rather were comments made directly to her on more than one occasion by her immediate supervisor, who had enormous influence in the decision-making process." Granting every inference to Dickinson's testimony, there can be no greater evidence than Lepera's statements to Dickinson that she selected Kisel because he was "new blood." As the court noted in Rose, "If the jury believed [plaintiff's] account, it could reasonably have found a forbidden motive at work." Id.[2] In this case, as in Rose, Lepera's statements directly refer to a discriminatory bias. See also Tyler, 958 F.2d at 1179, 1186-87 (shifting the burden where defendant had employees called "Young Tigers" and appraisals referred to "'youth' in a positive manner.").

---

[2] This case must be distinguished from Gallimore v. City University of New York Bronx Community College, 641 F.Supp.2d 269, 868 (S.D.N.Y. 2009) which CUNY cites, where the comments at issue "were not made in connection with the decision-making process," unlike here where Lepera's comments were made while explaining the decision to appoint the much younger Kisel.

CUNY's feigned inability to understand what Lepera could possibly have been referring to by telling Dickinson she wanted "new blood" is disingenuous.  Viewing the facts in context and in the light most favorable to Dickinson, Lepera was saying that she wanted a "young man" like Kisel in the full-time Hearing Representative position, not a middle-aged woman like Dickinson.  This fact is further bolstered by Lepera's words and actions toward Kisel since his arrival and the way she isolated Dickinson at that time. Under Price Waterhouse, therefore, it is CUNY's burden to establish that it would have made the same decisions regardless of Dickinson's age and gender.

Even if Lepera's "new blood" statement is not considered "direct" evidence, it is clearly sufficient to preclude summary judgment.  See Danzer v. Norden Sys., Inc., 151 F.3d 50, 53 (2d Cir. 1998) (reversing summary judgment where a senior executive held a meeting stating that the company needed "new blood – new and younger, fresh skills from out of schools."); Stampfel v. City of N.Y., 2005 U.S. Dist. LEXIS 36371, at *15 (S.D.N.Y. Dec. 27, 2005) (denying summary judgment where a senior official promoted "young blood" because "a reasonable juror could find the remark to be discriminatory."); Mace v. Marcus Whitman Cent. Sch. Dist., 2015 U.S. Dist. LEXIS 129827, at *24 (W.D.N.Y. Sep. 25, 2015) (holding that a comment about "young teachers" precluded summary judgment where the comment was made by "the Plaintiff's supervisor and the key decision-maker" and was "directly related to the employment decision at issue").

   3.   *CUNY's Efforts To Explain Away Lepera's*
        *Discriminatory Conduct Are Unavailing*

CUNY makes the ridiculous claim that Lepera's use of the term "kid" was innocent because she calls everyone "kid," including her elderly mother.  Dickinson disputes this claim and notes that during her time at CUNY, she was never called "kid" and the terms "kid" and "cute kid" were

reserved for Kisel.  (Dickinson Aff. ¶9).  CUNY's reliance on the Declaration of Maryam Malik –
a CUNY employee who currently reports to Lepera – cannot resolve this question of fact.  See
Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (recognizing that "although
the court should review the record as a whole, it must disregard all the evidence favorable to the
moving party that the jury is not required to believe.").

　　　In any event, CUNY's effort to suggest "alternative, nondiscriminatory interpretations" of
Lepera's references to youth "are arguments more properly addressed to the jury than to this Court."
Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998); see also Sassaman v. Gamache, 566
F.3d 307, 313 (2d Cir. 2009) (noting that whether "plaintiff's interpretation or that of defendants best
captures the meaning of Gamache's statement is not properly decided by this Court, or by the District
Court, on a motion for summary judgment . . . The choice between plausible interpretations of
Gamache's remarks is a question of fact to be resolved by a jury.").

　　　The United States Supreme Court has explicitly rejected CUNY's argument that Lepera could
not possibly have held a discriminatory bias because she is in the same protected categories as
Dickinson.  In Oncale v. Sundower Offshore Services, 523 U.S. 75, 78 (1998), the Court rejected
"any conclusive presumption" that the age of the decision-maker can serve as the basis for the drastic
relief of summary judgment, holding, "Because of the many facets of human motivation, it would
be unwise to presume as a matter of law that human beings of one definable group will not
discriminate against other members of their group."  A jury could find that Lepera, regardless of her
own status – and possibly because of it – declined to promote Dickinson because of her age and
gender, and instead favored the younger, male Kisel.  See Feingold v. New York, 366 F.3d 138, 155
(2d Cir. 2004) (rejecting the district court's suggestion that there was no inference of discrimination

where both the plaintiff and the perpetrator were Jewish because "[i]t is no more reasonable to presume that individuals will not discriminate against practitioners of their own religious faith."); Danzer, 151 F.3d at 55 ("The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable.").

CUNY also improperly asserts a "same actor inference," ignoring that it was Kisel's arrival after Dickinson was hired that changed her work environment.  See Feingold, 366 F.3d at 155 (2d Cir. 2004) (rejecting the same actor inference because such an inference "would not necessarily apply here given the changes in circumstances during the course of Feingold's employment."); Carlton, 202 F.3d at 138 (recognizing that the "inference alone cannot support summary judgment in this case where circumstances could have changed over the course of time.").  The same actor inference is even more inapplicable to the decision to fire Dickinson, as Dickinson's complaint of discrimination was clearly an intervening event that CUNY conveniently ignores.

It is completely inappropriate for CUNY to seek dismissal based on the fact that it ultimately replaced Dickinson with an older woman – *after* Dickinson had asserted a claim for discrimination. In Holcomb v. Iona College, 521 F.3d 130, 143 (2d Cir. 2008), a race discrimination case, the company defended itself by arguing that after it fired plaintiff, three of the individuals it hired were African-American.  Reversing summary judgment, the Second Circuit held that "a reasonable finder of fact might determine that the college hired a black coach as a way of concealing its prior discrimination."  Id., citing Gonzalez v. Police Dept., City of San Jose, Cal., 901 F.2d 758, 762 (9th Cir. 1990) ("Curative measures simply do not tend to prove that a prior violation did not occur."). In this case, as in Holcomb, a jury could find that CUNY deliberately sought out an older woman to fill Dickinson's former role as a means of concealing its prior discrimination.

10

Additionally, Dickinson need not prove that Lepera discriminated against every older woman, but only that Dickinson's age and gender impacted her employment. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*.") (emphasis in original); Carlton, 202 F.3d at 138 (noting that "[a]lthough Mystic points out that it employs numerous individuals within the protected age group, such evidence is not dispositive."). While Lepera may have permitted an older woman to fill the part-time position, she chose the "cute kid" that Lepera felt was "energetic" and "new blood" to fill the acting full-time position. The person who assumed Dickinson's role – after Dickinson was fired for complaining about discrimination – is irrelevant.

Based on the foregoing, CUNY's arguments are unavailing.

**B.      Lepera's Subjective Explanation For Choosing Kisel
         Over Dickinson Is A Question of Credibility And
         Cannot Be Resolved On Summary Judgment**

It is undisputed that Dickinson – who had 15 years of experience handling unemployment insurance claims – was more qualified than Kisel, who had just recently finished law school with no experience beyond working as a student advocate during law school.[3]  (Dickinson Aff. ¶; Lepera Decl. ¶16).  Even on this motion, Lepera acknowledges that Dickinson had a "considerable edge in experience over Mr. Kisel." (Lepera Decl. ¶2).  The determination as to why Kisel was selected over Dickinson depends on Lepera's credibility and cannot be resolved on summary judgment.

---

[3]  CUNY represents that Kisel is a lawyer, but his name does not appear on a search of registered attorneys in New York State, http://iapps.courts.state.ny.us/attorney/AttorneySearch. Kisel's status as a law school graduate was clearly not significant to CUNY, since he was still paid less than Dickinson.  (Lepera Decl. ¶17).

CUNY's entire defense boils down to Lepera's claim that she subjectively preferred Kisel's work. As a matter of law, such a self-serving and clearly biased explanation is insufficient for summary judgment. In <u>Weiss v. JPMorgan Chase & Co.</u>, 323 Fed. Appx. at 661, the Second Circuit cautioned courts on relying on the subjective opinion of the harasser, holding:

> In employment discrimination cases, courts must give particular scrutiny to subjective evaluations because (1) any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case and (2) a discriminatory consideration such as age could play into the formation of subjective impressions.

The court reversed summary judgment, finding that, to affirm, "this Court would necessarily have to accept as true [defendants's] subjective assessment" of plaintiff's performance, which plaintiff disputed. <u>Id</u>. at 665. In this case, as in <u>Weiss</u>, CUNY improperly relies on Lepera's subjective assessment, so that there are significant credibility issues. See <u>Ibok v. Securities Indus. Automation Corp.</u>, 369 Fed. Appx. 210, 214 (2d Cir. 2010) (reversing summary judgment where the defendants did not retain the plaintiff because of his disciplinary record, since "much of this record is potentially tainted by retaliatory animus."); <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 108 (2d Cir. 2009) (reversing summary judgment where the person "accused of being responsible for much of the discrimination" conducted the negative evaluation); <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 770 (2d Cir. 1998) (reversing summary judgment where "[n]early all of the record evidence supporting the Company's asserted non-retaliatory reason for discharge was generated by two of [plaintiff's] alleged harassers," finding that "there is a sufficient basis for a trier of fact to doubt the persuasiveness of the company's proffered evidence and ultimately find that the reasons offered by the Company for Quinn's dismissal were pretextual."); <u>Mate v. New York State Dept. of Transp.</u>,

24 A.D.3d 330, 332 (1st Dept. 2005) (denying summary judgment because "there are credibility issues concerning the validity of [plaintiff's] evaluations since the supervisor responsible for the evaluations is the same person who allegedly mistreated plaintiff"). Even in <u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93, 105 (2d Cir. 2001), which CUNY cites, the Second Circuit entitled summary judgment noting that while an employer may rely on subjective criteria, a plaintiff "is also entitled to challenging the credibility of the decision's rationale."

CUNY fails to offer a credible explanation for why the less-qualified Kisel was selected for the acting full-time role, other than that Lepera believed he was a "cute kid." The two reasons Lepera offered in her Declaration are not supported by the record. The first is that Lepera did not want Dickinson to "give up" her private practice. (Lepera Decl. ¶29). This makes no sense, since Dickinson had already told Lepera that she would have no problem giving up her private practice for an opportunity at a full-time role. (Dickinson Aff. ¶16).

Secondly, CUNY's motion is based upon the fiction that Dickinson's employment was "on shaky ground" before she complained about discrimination in February 2014. (CUNY Brief pg. 18). This is a vehemently contested issue that is based on nothing more than Lepera's after-the-fact spin. (Dickinson Aff. ¶18). It simply does not make sense that Dickinson would be concerned about her continued employment in December 2013, only to be upset that she did not obtain the full-time position in January 2014 and file a complaint of discrimination shortly thereafter on February 10, 2014. When taking Dickinson's facts as true, CUNY's story does not make sense.

CUNY's claim that Dickinson testified that Lepera told her in December 2013 that "she was unhappy with [Dickinson's] work" (CUNY Brief pg. 18) is a gross exaggeration of Dickinson's testimony. What Dickinson actually testified to was that in or around December 2013 – which was

shortly after Kisel started working at CUNY – Lepera "started finding issues with my work." (Exhibit U, pg. 54). It is remarkable that CUNY would convert this vague statement into some kind of admission that Dickinson felt she was on the verge of being fired, or that her employment was on "shaky ground." CUNY also distorts Dickinson's deposition testimony about the late January 2014 meeting where Lepera told Dickinson she had chosen Kisel. (Exhibit U, pg. 47:19-22 "And I said, 'So what's going to happen to me?' And she said, 'Well, I'll let you know what's going to happen to you.' I was very taken aback. I was disappointed."). Dickinson's testimony simply does not support CUNY's sweeping claim that Dickinson felt her position was threatened in December 2013.

Lepera's specific complaints about Dickinson's performance are too full of holes to warrant summary relief. For example, Lepera's claim that Dickinson did not make closing arguments is not correct, as Dickinson routinely made closing statements. (Dickinson Aff. ¶20). Lepera's only written reference to this issue was an email dated April 4, 2014 – after Dickinson's complaint – which falsely stated that they had spoken about the issue before. (Dickinson Aff. ¶20). Since CUNY was in the middle of responding to Dickinson's complaint of discrimination, Dickinson decided not to respond to Lepera's distortion. (Dickinson Aff. ¶20).

Lepera's Declaration regarding her alleged conversations with Dickinson about closing statements is deceptive. Lepera creates the impression that she "first noticed" an issue when she received a transcript from a July 2013 hearing, which arrived at the Unit "a few months later," and that Lepera discussed these issues with Dickinson in 2013. (Lepera Decl. ¶19). This sentence then refers to an email that Lepera sent to Dickinson on April 4, 2014, many months later and shortly after Dickinson complained of discrimination. (Dickinson Aff. ¶20). CUNY's effort to misrepresent the record reflects the issues of fact that exist.

14

Lepera's claim that Dickinson somehow did not understand the law in the *Pelicot* matter is incorrect and did not lead to the negative result in that matter, as the real reason for the outcome was Lepera's decision to go forward without calling a witness with first-hand knowledge.  (Dickinson Aff. ¶21).  Lepera's claim that Dickinson did not use cover sheets is simply inaccurate, and CUNY's reliance on unfinished cover sheets that Lepera cherry-picked is improper.  (Dickinson Aff. ¶22).

The determination as to what motivated Lepera to select the less qualified but substantially younger "cute kid" over Dickinson can only be made by a jury.  See Ames v. Cartier, Inc., 193 F.Supp.2d 762, 768 (S.D.N.Y. 2002) (noting that "the court cannot contemplate any legitimate, nondiscriminatory reason which could dispel the inference raised by plaintiff's proffered evidence.").

## C.    Dickinson Experienced A Hostile Environment

A jury could also find that Lepera's conduct was "sufficiently severe or pervasive" to alter the conditions of Dickinson's employment and create an abusive working environment.  See Pucino v. Verizon Communs., Inc., 618 F.3d 112, 119 (2d Cir. 2010) (recognizing that "a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions.").   Dickinson need not show that the environment was "'unendurable' or 'intolerable,'" but only that "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Feingold, 366 F.3d at 150; Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (noting that "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.") (citation omitted).

15

In this case, Dickinson's workplace changed dramatically after Kisel's arrival. From the start of Dickinson's employment, Lepera had consistently complimented Dickinson and told her that she would receive the next available full-time role. When Kisel arrived, however, Lepera stopped interacting with Dickinson and excluded Dickinson from meetings she had with him, all while gushing about how "cute" and "energetic" Kisel was. (Dickinson Aff. ¶7). Once an acting full-time role became available, Lepera assigned it to Kisel without even discussing it with Dickinson. (Dickinson Aff. ¶11). To further escalate the hostility of selecting Kisel over Dickinson, despite Dickinson's years of greater experience and Lepera's prior representations, Lepera's explanation was that she wanted "new blood," which was a clear reference to Kisel's age and gender.[4] (Dickinson Aff. ¶11).

By assigning Kisel the acting role, she gave him a significant advantage in obtaining the role on a permanent basis. The Declarations CUNY submits in support of its motion confirm this fact, as both Oswald Frasier and Sangeeta Noel, who were members of the search committee, note that they recommended Kisel for the permanent position because he "was working in an acting capacity in the full-time position." (Frasier Decl. ¶11; Noel Decl. ¶11). Kisel's experience in the acting role also helped him overcome the fact that he did not possess the minimum qualifications needed for the full-time position. By assigning Kisel the acting role, Lepera effectively ended Dickinson's chance at obtaining the full-time role, particularly since the decision was ultimately up to Lepera. All of this is what caused Dickinson to complain to CUNY's Diversity and Compliance Program shortly thereafter. Dickinson's hope for advancement at CUNY was over. (Dickinson Aff. ¶24).

---

[4] On this motion, it must be taken as true that Lepera made this comment, so that Lepera's denials are irrelevant.

CUNY unfairly minimizes the devastating impact that Lepera's conduct had on Dickinson, and would have on any individual under the circumstances. Dickinson had been handling unemployment claims for 15 years and reasonably believed, based on Lepera's statements to her, her appointment at CUNY could lead to a full-time employment in that capacity, more than the semester-by-semester position she then held. (Dickinson Aff. ¶5). Such full-time employment positions are neither common nor easy to obtain in this field, as confirmed by the fact that CUNY convenes a search committee to hire someone into this full time role. (Dickinson Aff. ¶3). More than just employment and benefits, the full-time role also offered an opportunity for advancement that came along with it, as illustrated by the fact that Kisel has since been promoted and is now Deputy Director. (Dickinson Aff. ¶44). Dickinson was denied this opportunity because Lepera wanted to hire the "cute kid" who offered "new blood," even though she acknowledges that Dickinson has a "considerable edge in experience" over Kisel. (Lepera Decl. ¶2).

Under the unique circumstances of this case, therefore, a jury could find that Dickinson has established a hostile work environment claim. See Redd, 678 F.3d at 176 (directing that courts should "not view individual incidents in isolation" or "review the record in a piecemeal fashion."); Ruhling v. Tribune Co., 2007 U.S. Dist. LEXIS 116, at *52 (E.D.N.Y. Jan. 3, 2007) ("In assessing the overall hostility of a workplace, charges of discrimination must be considered cumulatively in order to obtain a realistic view of the work environment.") (citations omitted).

**D.      CUNY's Ineffective Investigation**

CUNY responded to Dickinson's complaint of discrimination by conducting a superficial investigation, run by Michael Collins ("Collins"), Associate Director of Diversity and Compliance. For example, Collins claims to have spoken to Lepera about whether she called Kisel "cute" and

"young and energetic," yet his contemporaneous notes of the interview with Lepera make no mention of asking Lepera about these comments.  (Dickinson Aff. ¶29; Exhibit K; MC 32-33).  Collins' investigation was not accurate, as he incorrectly wrote in his notes that Dickinson having her work station taken from her was resolved, even though it was an ongoing problem.  (Dickinson Aff. ¶30; Exhibits L, M).  Remarkably, Collins admitted that he did not even consider the possibility that the performance issues raised by Lepera were pretextual.  (Dickinson Aff. ¶31; Exhibit W; MC 61).  All that Collins' investigation accomplished was to empower Lepera to feel vindicated and free to retaliate against Dickinson, which Lepera did by terminating Dickinson just seven days later.

## POINT II

## DICKINSON ESTABLISHES A CLAIM OF RETALIATION

Dickinson's retaliation claim is analyzed under the three-step burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, Dickinson must make out a prima facie case.  The burden then shifts to CUNY to provide a legitimate, non-discriminatory reason for its actions.  If CUNY does so, the burden shifts back to Dickinson to show that CUNY's explanation is a pretext for retaliation.  See Vogel v. CA, Inc., 662 Fed. Appx. 72, 75 (2d Cir. 2016).

Dickinson must only show that her termination would not have occurred in the absence of a retaliatory motive.  See Kwan v. Andalex Group, LLC, 737 F.3d 834, 846 (2d Cir. 2013) (noting that "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.") (citing Fagan v. U.S. Carpet Installation, Inc., 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011) (explaining that under the ADEA, "the condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employer's only

18

consideration, but rather that the adverse employment actions would not have occurred without it.").

**A.      Dickinson Establishes A Prima Facie Case**

To establish a *prima facie* claim of retaliation, Dickinson must, and does, establish that: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." See Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (recognizing that "the burden of proof at the *prima facie* stage has been characterized as 'minimal' and '*de minimis*.'"). It is undisputed that Dickinson's failure to be appointed to the full-time position and termination are adverse employment action, so that prong of the prima facie case is not addressed herein.

*1.      Dickinson's Protected Activities Of Which CUNY Was Aware*

It is undisputed that Dickinson engaged in protected activity.  Dickinson first made a formal complaint of discrimination on February 10, 2014, then spoke to Kam Wong ("Wong"), the Associate Director of Diversity and Compliance Program at CUNY on February 13, 2014, provided a written Charge Form at Wong's request on February 18, 2014, and then again spoke to Wong's successor, Michael Collins ("Collins") on February 26, 2014.  (Dickinson Aff. ¶¶24, 26).  Dickinson also retained an attorney who was in contact with CUNY.  It is also undisputed that Lepera became aware of Dickinson's complaint of discrimination in or around February 2014.  (Lepera Decl. ¶41; Dickinson Aff. ¶¶24, 25; Exhibit H).

*2.      Dickinson's Termination Was Causally Connected To Her Complaints*

Around April 8, 2014, Collins informed Dickinson that her complaint of discrimination was "not substantiated."  (Dickinson Aff. ¶33; Exhibit F).  On April 21, 2014, *less than two weeks later,*

Lepera told Dickinson that Dickinson would not be re-appointed to CUNY in any capacity. (Dickinson Aff. ¶34). This striking temporal proximity is sufficient to create a question of fact about Lepera's motive for terminating Dickinson. A jury could find that Lepera felt vindicated by CUNY's investigation and retaliated against Dickinson by firing her less than two weeks after its conclusion.

CUNY improperly looks only to the temporal proximity between Dickinson's first complaint on February 10, 2014 and her termination on April 21, 2014, ignoring her continued protected activities thereafter. See Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002) (noting that looking only at the time between the plaintiff's first complaint and subsequent adverse employment action "ignores [plaintiff's] protected activity between those two dates.").

Nonetheless, the little more than two months between her first complaint and her termination is sufficiently close to create a question of fact. See Summa, 708 F.3d at 128 (finding a "reasonably close temporal proximity" where there was a "seven-month gap" between the plaintiff's protected activity and the decision to terminate her employment) (citing Grant v. Bethelehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980)) (finding causation with a temporal proximity of eight months); Gorzynski, 596 F.3d at 104-105 ("We have previously held that five months is not too long to find the causal relationship."); Jute, 420 F.3d at 176 (reversing summary judgment where there was a temporal proximity of 14 months); Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 555 (2d Cir. 2001) (holding that a temporal proximity of four months "is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion."); Guzman v. News Corp., 2013 U.S. Dist. LEXIS 155026, at *60 (S.D.N.Y. Oct. 28, 2013) (denying summary judgment where there was a gap of seven months between the plaintiff's complaint and her termination); Conklin v. Cty. of Suffolk, 859 F. Supp. 2d 415, 431 (E.D.N.Y. 2012) (denying

summary judgment where "most of the relevant events happened within a time frame of only five and a half months").

In addition to temporal proximity, the record provides evidence of a retaliatory animus. Documents produced during discovery indicate that right after Lepera learned of Dickinson's compliant, she began to create a file that she filled with-self serving memos to create a pretext of poor performance.  (Dickinson Aff. ¶27, Exhibit I).  Even in her Declaration, Lepera acknowledges that she started writing "file memos and other written comments on plaintiff's work performance" in direct response to Dickinson's protected activity.  (Lepera Decl. ¶41).  Whether her motivation for doing so was based on the suggestion of "various people" whom she cannot remember (Lepera Decl. ¶42), or to create a pretext based on performance, is a question of intent for a jury.  See Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 466 (S.D.N.Y. 2013) (noting that "evidence of an employer's anger at its employee for engaging in a protected activity may well constitute direct causal evidence.").[5]  Dickinson establishes a prima facie case of retaliation.

**B.**     **CUNY's Explanation For Firing Dickinson Is A Pretext**

CUNY's entire argument for why Dickinson's termination rests on Lepera's denial that retaliation played a role.  (Lepera Decl. ¶50 – "My decision was based on my concerns about plaintiff's work performance and nothing else.").[6]  Such a self-serving assertion is insufficient to

---

[5]  This case must be distinguished from El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010), which CUNY cites, where the plaintiff pointed to nothing beyond the temporal proximity between his complaint about a co-worker and his termination three weeks later for lying on his application.

[6]  It is undisputed that it was Lepera's decision alone not to re-appoint Dickinson to another term, which terminated Dickinson's employment.  (See Williams Decl. ¶16).  Accordingly, CUNY's reference to the "cat's paw" theory of liability is inapplicable.  By way of example, CUNY's citation to Britt v. Merrill Lynch & Co., 2011 U.S. Dist. LEXIS 96881, at *29 (S.D.N.Y. Aug. 26, 2011), does not apply because, unlike in this case, the plaintiff's claim was based on an argument that a co-worker "influenced" decisions regarding her employment.

resolve the questions of credibility created by the strikingly close temporal proximity and Lepera's effort to create a paper trail regarding Dickinson's performance following Dickinson's complaint. See Weiss, 332 Fed. Appx. at 665 (reversing summary judgment because "[t]o affirm dismissal of Weiss' complaints on summary judgment, this Court would necessarily have to accept as true [defendant's] subjective assessment" of plaintiff's performance, which plaintiff controverted."); Williams v. Quebecor World Infiniti Graphics, 456 F.Supp.2d 373, 384 (S.D.N.Y. 2007) (denying summary judgment because "[a]n employer's subjective evaluations are not adequate justifications by themselves because they may mask prohibited prejudice.").

It is simply improper for CUNY to ask the Court to decide as a matter of law that Lepera was only considering Dickinson's performance, not her ongoing complaint.  According to Lepera's Declaration, she learned about Dickinson's complaint of discrimination in late February 2014, was advised that Collins' found that complaint to be "unsubstantiated" in early April 2014, and made the decision to terminate Dickinson during a meeting on April 17, 2014.  (Lepera Decl. ¶¶41, 46-48). It is simply too much for CUNY to ask the Court to accept Lepera's claim that she ignored Dickinson's complaint when terminating Dickinson, given this remarkably close temporal proximity.

CUNY's entire basis for Dickinson's termination rests on Lepera's denial and a shaky explanation that does not make sense.  The first time Lepera made any kind of notation regarding Dickinson's work was immediately after learning of Dickinson's complaint of discrimination. (Dickinson Aff. ¶17; Exhibit H).  Lepera's claims are not even consistent, as Lepera states that she said during the meting on April 17 that Dickinson was still not consistently making closing statements (Lepera Decl. ¶48), but that was impossible for her to know since she also states that it took months to get the transcripts (Lepera Decl. ¶13).  Summary judgment is improper in this case.

22

**C.**   **CUNY's Distortion Of The Search Committee**

Throughout this litigation, CUNY has perpetuated the myth that because there was a Search Committee to fill the full-time position on a permanent basis, Lepera's discriminatory bias had no impact on the decision to select Kisel over Lepera.  The fact is, it is undisputed that it was Lepera's decision alone to select Kisel for the full-time position, so that the existence of the search committee is a red herring.  See Rose, 257 F.3d 156, 162 (2d Cir. 2001) (denying summary judgment where the plaintiff's supervisor, who had expressed a discriminatory animus, "had enormous influence in the decision-making process" that led to plaintiff's termination); Curley v. St. John's Univ., 19 F.Supp.2d 181, 192 (S.D.N.Y. 1998) ("A plaintiff need not prove every one of the decision-makers biased in order to argue that the discriminatory motives of some of the decision-makers rendered the decision discriminatory.").

CUNY claims that Lepera could not have considered Dickinson because the search committee did not forward her application to Lepera.  What the record reveals, however, is that Lepera firing Dickinson precluded Dickinson from ever being considered by the search committee. Frances Correa ("Correa"), the head of the search committee, confirmed that while Dickinson was qualified, she was not interviewed because Lepera had fired her.[7]  (FC 28, 29).  Correa thought interviewing Dickinson under those circumstances would have been a "waste of time," particularly since Lepera was the ultimate decision maker.  (FC 35-37).

---

[7] Lepera's self-serving claim that she did not know that Dickinson had applied for the position is disingenuous, since Lepera could reasonably have believed she had, particularly since Lepera states in her Declaration that she told Dickinson she would have an opportunity to apply.  (Lepera Decl. ¶37).  A jury could reject Lepera's feigned ignorance.  See Papelino v. Yu, 633 F.3d 81, 92 (2d Cir. 2011) (noting that while a defendant can claim that the individual who carried out the adverse action was not aware of the protected activity, "a jury is entitled to disregard such claims if they are unreliable.").

What the record reveals is that, in addition to taking Dickinson out of contention by firing her, Lepera manipulated the circumstances surrounding the search committee to ensure that Kisel, the "cute kid" who she saw as "new blood," would get the role.  First, Lepera promoted Kisel to the acting full-time position, which undeniably endorsed him for the position, overcoming the fact that he did not meet the minimum qualifications for the role.   (Dickinson Aff. ¶37; Exhibit B).  Dickinson, on the other hand, met both the minimum and preferred qualifications, and Lepera acknowledges that Dickinson "had a considerable edge in experience over Kisel." (FC 27, Lepera Decl. ¶2).  A jury could find that Lepera was concerned that the committee would recognize Dickinson's advantage and took steps to make sure the members never had a choice.

Additionally, Lepera distorted the qualifications of the other candidate that passed through the committee, Henry Gomez ("Gomez").  Gomez met both the minimum as well as the preferred qualifications and, from the notes of the search committee, was interested in the position. (Dickinson Aff. ¶¶40-41; Exhibit S).  When Lepera interviewed Gomez, however, he was a completely different candidate.  According  to Lepera, Gomez said he was "tired of doing investigations" and was not interested.  (Exhibit R).  Correa was surprised to hear this negative feedback about Gomez. (FC 39). Lepera's claim that Gomez botched his interview is even more questionable since Les Williams ("Williams"), Lepera's supervisor, was present at Lepera's interview with Gomez, but his Declaration makes no mention whatsoever about how poorly Gomez allegedly performed at his interview.

At the end of the search committee's involvement, Lepera had only two candidates to decide between: Kisel and Gomez.  Lepera had removed Dickinson from consideration by firing her. Lepera selected Kisel, the "cute kid" she wanted all along, while Dickinson was left without a job.  A jury

24

could find that Lepera's actions were motivated both by a discriminatory preference for Kisel, and a retaliatory animus against Dickinson.

## **CONCLUSION**

For the foregoing reasons, Dickinson respectfully requests that CUNY's motion for summary judgment be denied in its entirety and for such further relief as this court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:  */s Brian Heller*
      BRIAN HELLER (4004)
      DAVIDA S. PERRY (1879)
      295 Madison Avenue
      New York, New York 10017
      (212) 889-6565