UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                        :

JOANNAH DICKINSON,                     :
                                        :

                         Plaintiff,     :

               - against -              :

                                          :

CITY UNIVERSITY OF NEW YORK,      :
                                          :

                         Defendant.   :
                                          :
----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/11/2018

16-CV-1036 (VSB)

**OPINION & ORDER**

<u>Appearances</u>:

Brian Heller
Davida S. Perry
Schwartz Perry & Heller, LLP
New York, New York
*Counsel for Plaintiff*

Clement J. Colucci
Office of the Attorney General
New York, New York
*Counsel for Defendant*

<u>VERNON S. BRODERICK</u>, United States District Judge:

        Plaintiff Joannah Dickinson brings this action against Defendant City University of New York ("CUNY") alleging claims for sex and age discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2–3, *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, *et seq.*; and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, *et seq.* Defendant moves for summary judgment on all of Plaintiff's claims. Because Plaintiff has set forth sufficient evidence as to her age discrimination and retaliation claims to create a genuine issue of disputed material fact, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## I.    Background

This action involves CUNY's Unemployment Insurance/Workers' Compensation Unit (the "Unit").  The Unit is responsible for reviewing, and sometimes contesting, applications for unemployment insurance benefits from individuals formerly employed by CUNY.  (Counter 56.1 ¶ 3.)[1]  When it is necessary to contest such applications, Unit staff investigate, prepare, and conduct hearings before the New York State Department of Labor, as well as any appeals of decisions from those hearings.  (*Id.*)  Approximately half of the Unit's hearings deal with three provisions of the New York Labor Law ("NYLL"), N.Y. Labor Law §§ 590(10), 590(11), 511(15), which relate to situations relevant only to academic employment, (*id.*).

### A.    *Hiring of Plaintiff*

Ann Lepera has been Director of the Unit since October 2003.  (*Id.* ¶ 4.)  As Director, she has administrative responsibilities and conducts hearings.  (*Id.*)  Lepera hired Plaintiff in June 2013, after interviewing several candidates, to serve as a part-time Hearing Representative on a semester-by-semester basis.  (*Id.* ¶¶ 1, 5.)  Plaintiff had fifteen years of experience handling unemployment insurance claims, (Dickinson Aff. ¶ 3),[2] experience which impressed Lepera, (Lepera Decl. ¶ 11).[3]  Plaintiff was nearly forty-nine years old at the time of her hiring, and Lepera was fifty-five years old.  (Counter 56.1 ¶ 6.)  Plaintiff's initial appointment extended through the end of the Fall 2013 semester.  (*Id.* ¶ 7.)  Due to her part-time private practice, Plaintiff worked two days per week.  (*Id.*)

---

[1] "Counter 56.1" refers to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, filed June 8, 2017.  (Doc. 46.)  For ease of reference, I refer to this submission because it incorporates the substance of Defendant's Rule 56.1 Statement, (Doc. 39).  Unless otherwise indicated, references to Plaintiff's Counter 56.1 indicate undisputed facts.

[2] "Dickinson Aff." refers to the Affidavit of Joannah Dickinson, filed on June 8, 2017.  (Doc. 44.)

[3] "Lepera Decl." refers to the Declaration of Ann Lepera, filed on May 8, 2017.  (Doc. 34.)

Plaintiff claims that for the first five months of her employment, she had a good, friendly working relationship with Lepera. (Dickinson Aff. ¶ 4.) She received only positive feedback from Lepera about her work, and Lepera never complained about Plaintiff or coached her to remedy any deficiencies in her performance. (*Id.*) From the beginning of Plaintiff's appointment, Lepera indicated to Plaintiff that she would be given a full-time position when Lepera obtained authorization for such a position. (*Id.* ¶ 5.)

Lepera claims that for the first several months of Plaintiff's employment, she had little opportunity to assess Plaintiff's work due to the workload of the Unit. (Lepera Decl. ¶ 13.) Lepera could not find time to attend Plaintiff's hearings, so her only source of information about Plaintiff's performance at hearings was hearing transcripts and comments in the opinions of hearing officers, which would generally arrive to the Unit "up to a couple of months after the fact." (*Id.*) However, Lepera did occasionally review Plaintiff's files or ask her Assistant Director, Maryam Malik, to review them. (*Id.* ¶ 14.)

### B.    *Hiring of Alexander Kisel*

Because of the Unit's busy workload, Lepera hired another part-time, non-teaching adjunct in the Fall 2013 semester—Alexander Kisel. (Counter 56.1 ¶ 8.) At the beginning of his employment, Kisel was in his twenties. (*Id.*) Kisel's resume indicates he was a lawyer at the time of his hiring, which Plaintiff disputes because he is not currently registered with the New York State Bar. (*Id.*) Kisel's resume also indicates that the only experience he had handling unemployment cases was as a student advocate in law school. (Dickinson Aff. ¶ 6, Ex. D.) His salary was $44.12 an hour, (Lepera Decl. ¶ 17), while Plaintiff's salary was $47.58 an hour, (*id.* ¶ 12).

Plaintiff claims that her relationship with Lepera changed dramatically once Lepera hired

Kisel. In particular, Plaintiff claims that "Lepera was infatuated with Kisel from the moment he arrived," and in particular seemed enamored with his youth. (Dickinson Aff. ¶ 7.) According to Plaintiff, Lepera frequently referred to Kisel as "kid," "cute," "young," and "energetic." (*Id.*) Lepera acknowledges that she referred to Kisel as a "cute kid" once or twice, but that she also called others in the Unit "kid," including Malik, and Lepera also referred to her own mother as "kid". (Lepera Decl. ¶ 44.) In addition, Lepera states that she found certain of Kisel's mannerisms and habits endearing, including his "taste for bad puns." (*Id.*) Malik acknowledges that Lepera "routinely refers to practically everyone in the Unit as 'kid,'" including Malik, and that she has heard Lepera refer to her mother as "kid" on at least one occasion. (Malik Decl. ¶ 4.)[4] Malik also states that Lepera has referred to Kisel as "cute" frequently, but that it was in the context of Kisel's puns. (*Id.* ¶¶ 5–6.)

Plaintiff disputes the frequency and the context in which Lepera referred to Kisel as "cute kid" or "cute." Specifically, Plaintiff claims that Lepera reserved the terms "cute kid" or "cute" for Kisel, and that Plaintiff never heard Kisel make a pun. (Dickinson Aff. ¶¶ 8–9.) She also claims that Lepera had "frequent closed door meetings with Kisel" that did not include Plaintiff, that Lepera ceased all discussions with Plaintiff regarding a full-time position, and that Lepera stopped sharing her sister-in-law's jewelry catalogues with Plaintiff. (*Id.* ¶ 10.)

## C. *Announcement of Full-Time Position and Appointment of Kisel to Acting Position*

Lepera states that Les Williams—then University Executive Director of Human Resources Shared Services, and Lepera's supervisor, (Williams Decl. ¶ 1)[5]—informed her in January 2014 that a full-time Associate Director position in the Unit had been approved and that

---

[4] "Malik Decl." refers to the Declaration of Maryam Malik, filed on May 8, 2017. (Doc. 36.)

[5] "Williams Decl." refers to the Declaration of Les Williams, filed on May 8, 2017. (Doc. 35.)

Lepera should organize a search committee to find someone to fill the position, (Lepera Decl. ¶¶ 27–28). Williams also informed her that in the meantime she could appoint someone from the existing staff to serve as acting Associate Director. (*Id.* ¶ 28.)

Lepera appointed Kisel to serve as the acting Associated Director of the Unit while a search committee was assembled to find a person to serve in the position permanently. (Counter 56.1 ¶ 15.) On January 23, 2014, Lepera called a staff meeting to announce Kisel's appointment and the search for someone to fill the permanent position. (*Id.* ¶ 17.)

Prior to the staff meeting, Lepera asked Plaintiff to meet with her. (Dickinson Aff. ¶ 11; Lepera Decl. ¶ 37.) The parties agree that Lepera informed Plaintiff at this meeting that Kisel would assume the acting position. (Dickinson Aff. ¶ 11; Lepera Decl. ¶ 37.) The remaining details of this meeting are heavily disputed.

Lepera claims that she told Plaintiff that Plaintiff's "work was lacking in certain respects," that Plaintiff "was not following [Lepera's] directions," that Lepera expected Plaintiff to write up each hearing she attended so someone could pick up her files quickly and easily, and that Plaintiff's "written work was rushed and that she was not detail-oriented." (Lepera Decl. ¶ 38.) According to Lepera, Plaintiff asked if Lepera was firing her, and Lepera responded that she would have told her at the meeting if she were planning on firing her. (*Id.* ¶ 39.)

Plaintiff claims that she was extremely upset at the news that Kisel would assume the acting position, since it had been promised to her by Lepera since Plaintiff began her job. (Dickinson Aff. ¶ 11.) According to Plaintiff, Lepera informed Plaintiff that she wanted "new blood" in the new position, which Plaintiff understood to mean a young man rather than a middle-aged woman. (*Id.* ¶¶ 11–12.) Lepera denies making this comment. (Lepera Decl. ¶ 45.) Plaintiff states that when she asked what would happen to her, Lepera responded, "Well, I'll let

you know what's going to happen to you," but did not comment further at that time. (Dickinson Aff. ¶ 13.) According to Plaintiff, Lepera never told her that her performance had anything to do with Lepera's decision, and Plaintiff never asked Lepera if she was going to be fired. (*Id.* ¶ 14.)

Lepera claims that she chose Kisel over Plaintiff for the acting position because of certain problems she had observed with Plaintiff's work. (Lepera Decl. ¶ 29.) According to Lepera, the principal problems were Plaintiff's: (1) failure to make closing arguments at all hearings; (2) lack of understanding of the relevant NYLL provisions principally utilized by the Unit; and (3) sloppy file maintenance and correspondence. (*Id.* ¶¶ 18–26.)

Lepera asserts she informed Plaintiff when Plaintiff started that it was CUNY policy to make closing arguments at hearings. (*Id.* ¶ 19.) Nevertheless, Lepera first noticed Plaintiff was waiving the right to make closing arguments when she reviewed the transcript of a July 2013 hearing a few months after the hearing. (*Id.*) Plaintiff repeated the mistake in an October 2013 hearing, and again in a January 2014 hearing. (*Id.* ¶ 20.) Lepera spoke to Plaintiff about this issue in April 2014 and sent a follow-up email reminding Plaintiff of her instructions. (*Id.*) Plaintiff claims Lepera never told her to make closing statements in every case. (Dickinson Aff. ¶ 20.) Rather, she raised the subject of closing statements with Plaintiff in December 2013, but did not tell her to make a closing statement in every case until the April 2014 email. (*Id.*)

Lepera also states that in her discussions with Plaintiff, Plaintiff did not seem to understand certain issues related to the NYLL provisions regularly at issue during hearings. (Lepera Decl. ¶¶ 21, 23.) Lepera identified one case where she believed the Unit lost due to Plaintiff's inadequate presentation of issues. (*Id.* ¶ 23.) Plaintiff disputes the assertion that she did not have a competent understanding of the relevant NYLL provisions, and claims that a decision by Lepera resulted in the loss that Lepera attributes to Plaintiff's poor understanding of

the NYLL.  (Dickinson Aff. ¶ 21.)

Lepera also states that Plaintiff's file maintenance and correspondence were sub-par, particularly because she resisted Lepera's repeated advice to create a hearing sheet for each of her files, making it difficult for co-workers to pick up her hearings on days she did not work. (Lepera Decl. ¶¶ 24–25.)  Kisel, on the other hand, was "thorough and well-organized."  (*Id.* ¶ 26.)  Plaintiff claims she created adequate hearing cover sheets for all of her files, and that Lepera selectively cites to incomplete files in her declaration.  (Dickinson Aff. ¶ 22.)

Finally, Lepera claims that she declined to offer Plaintiff the acting, full-time position because Plaintiff would have to give up her part-time private practice.  (Lepera Decl. ¶ 29.) Plaintiff states that she told Lepera she would have no problem giving up her part-time private practice for a full-time position.  (Dickinson Aff. ¶ 16.)

Lepera claims that her concerns about Plaintiff's work performance not only caused her not to appoint Plaintiff to the acting position, but also caused her to question whether to reappoint Plaintiff to her part-time position for the Spring 2014 semester.  (Lepera Decl. ¶ 34.) She met with Williams and Sonia Pearson, a Human Resources Director at CUNY, to discuss her concerns at some point prior to the beginning of the Spring 2014 semester.  (*Id.* ¶ 35; Williams Decl. ¶¶ 9–11.)  According to Lepera, she ultimately decided to give Plaintiff a chance to improve her performance.  (Lepera Decl. ¶ 36.)  Lepera reappointed to Plaintiff to her part-time position for the Spring 2014 semester.  (Counter 56.1 ¶ 14.)

### D.    *Plaintiff's Discrimination Complaint*

On February 10, 2014, Plaintiff filed a formal complaint against Lepera with Kam Wong—Associate Director of Compliance—alleging age and gender discrimination.  (Counter 56.1 ¶ 26.)  Wong interviewed Plaintiff on February 13, 2014, and instructed her to file her

complaint on CUNY's prescribed charge form. (*Id.* ¶ 27.) Wong left CUNY shortly after her interview of Plaintiff, and Michael Collins—University Director for Diversity and Compliance—took over the investigation. (*Id.* ¶ 28.) He re-interviewed Plaintiff and interviewed Lepera. (*Id.*)

Lepera initially learned about Plaintiff's complaint on or about February 19, 2014. (Dickinson Aff. ¶ 27, Ex. H; Lepera Decl. ¶ 41.) Lepera claims that after learning of Plaintiff's complaint, she began documenting her concerns with Plaintiff's work in writing, on the advice of a person who she does not remember. (Lepera Decl. ¶ 42.)

On April 8, 2014, Collins reported his conclusions and his determination that Plaintiff's discrimination complaint could not be substantiated. (Counter 56.1 ¶ 32.) He informed Plaintiff and Lepera of his determination. (*Id.*) Plaintiff claims that Collins's investigation was "superficial" and "ineffective" because he recorded inaccurate information in his notes and never considered the possibility that Lepera's performance concerns may have been pretextual. (Dickinson Aff. ¶¶ 29–31.)

### E.    *The Termination of Plaintiff's Employment*

In April 2014, after learning that Plaintiff's discrimination complaint had been unsubstantiated, Lepera had to decide whether to reappoint Plaintiff for the following semester. (Counter 56.1 ¶ 35.) After meeting with Williams and Pearson and reviewing with them her continued concerns with Plaintiff's work performance, Lepera recommended that Plaintiff not be reappointed. (*Id.* ¶ 36.) Lepera and Williams met with Plaintiff on April 21, 2014 to tell her that she would not be reappointed. (*Id.* ¶ 37.) During the meeting, when she was told that she was not going to be reappointed, Plaintiff stated that she believed the decision was based on her filing of a discrimination complaint and walked out of the meeting. (*Id.*) Lepera states that she replaced Plaintiff with a woman who was older than Plaintiff. (Lepera Decl. ¶ 53.)

## F.     *The Search Committee*

CUNY's standard procedures required Lepera as the responsible hiring officer to assemble an independent search committee to recommend individuals to fill the permanent full-time position.  (Counter 56.1 ¶ 22.)  Lepera assembled a search committee, which was responsible for reviewing and recommending candidates to Lepera, who would then interview and select a person to fill the position.  (*Id.* ¶¶ 22–23.)  CUNY's procedures did not require Lepera to select any of the recommended candidates, but she could not hire anyone the committee did not recommend.  (*Id.* ¶ 22.)  If Lepera did not pick someone from the list of recommended candidates, the committee would have to perform a new search and recommend additional candidates.  (*Id.*)

Lepera named three members to the search committee:  Francis Correa, Oswald Fraser, and Sangeeta Noel.  (*Id.* ¶ 23.)  Lepera had professional relationships with each member of the committee, but no social or close personal relationships.  (*Id.*)  Correa served as chair of the committee.  (*Id.*)  Before the committee embarked on its search, Lepera provided it with a written job description for the position, and Collins explained to the members how the search process would proceed.  (*Id.* ¶ 24.)

On the same day Lepera selected Kisel for the acting position, she informed both Kisel and Plaintiff of the search committee and welcomed them to apply for the permanent position.  (Lepera Decl. ¶ 37.)  Plaintiff submitted an application to the search committee on April 14, 2015, one week before she was terminated.  (Dickinson Aff. ¶ 34.)  Plaintiff states that she met both the minimum and preferred qualifications for the position, while Kisel did not.  (*Id.* ¶ 37.)  Noel and Fraser, two members of the search committee, state that they do not recall Plaintiff, but upon reviewing her application, they conclude that she would have been someone that the

committee would have called in for an interview.  (Noel Decl. ¶ 8; Fraser Decl. ¶ 8.)[6]  It appears that Fraser may have suggested to the committee that Plaintiff be called in for an interview, but Correa informed the committee that Lepera had decided not to reappoint Plaintiff to her part-time position for reasons not disclosed to Correa, thereby making it futile to call Plaintiff in for an interview because Lepera had already made a decision not to reappoint her.  (Noel Decl. ¶¶ 8–10; Fraser Decl. ¶¶ 8–10.)

The search committee recommended three candidates to Lepera, one of whom was Kisel, whom she ultimately selected.  (Dickinson Aff. ¶ 42; Lepera Decl. ¶¶ 51–52; Noel Decl. ¶ 11; Fraser Decl. ¶ 11.)  Lepera claims that at no point did she communicate her views about who should take the permanent, full-time position to the search committee, (Lepera Decl. ¶ 32), which Noel and Fraser corroborate, (Noel Decl. ¶ 6; Fraser Decl. ¶ 6).  Noel and Fraser also state that they were unaware of Plaintiff's discrimination complaint while they were on the committee. (Noel Decl. ¶ 12; Fraser Decl ¶ 12.)

## II.   __Procedural History__

Plaintiff filed this action in New York County Supreme Court on January 26, 2016. (Doc. 1.)  Defendant removed it to this court on February 10, 2016, (*id.*), and it was assigned to me the next day.  On March 16, 2016, Defendant filed an Answer to the Complaint.  (Doc. 9.)

After the completion of discovery, Defendant filed a motion for summary judgment on May 8, 2017, (Doc. 32), along with supporting declarations, (Docs. 33–38), a Rule 56.1 Statement of Facts, (Doc. 39), and a memorandum of law, (Doc. 40).  Plaintiff filed her opposition on June 8, 2017, (Doc. 43), along with supporting affidavits and declarations, (Docs.

---

[6] "Noel Decl." refers to the Declaration of Sangeeta Noel, filed on May 8, 2017.  (Doc. 38.)  "Fraser Decl." refers to the Declaration of Oswald Fraser, filed on May 8, 2017.  (Doc. 37.)

44–45), and her Counter 56.1, (Doc. 46).  On June 22, 2017, Defendant filed its reply memorandum.  (Doc. 47.)

### III.    <u>Legal Standards</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256 (citation omitted), and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the

court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

In addition, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## IV. Discussion

Plaintiff brings claims under Title VII, the ADEA, and the NYSHRL for (1) discrimination on the basis of sex and age, (2) retaliation, and (3) hostile work environment. I first address Plaintiff's discrimination and retaliation claims, and then turn to Plaintiff's hostile

work environment claims.

### A. *Discrimination and Retaliation*

#### 1. Applicable Law

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA makes it an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). The NYSHRL makes it unlawful for an employer "to refuse to hire or employ or to discharge from employment" a person on the basis of the "individual's age . . . [or] sex." N.Y. Exec. Law § 296.

Discrimination claims under Title VII, the ADEA, and the NYSHRL are analyzed using the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) ("It is well established that the burden-shifting framework set forth by the Supreme Court in *McDonnell* . . . applies to claims brought under the ADEA."); *Ferraro v. Kellwood Co*, 440 F.3d 96, 99 (2d Cir. 2006) ("In discrimination claims brought under the [NYSHRL], the burden-shifting framework established by the Supreme Court in *McDonnell* . . . applies."). First, the employee bears the burden of setting forth a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To set forth a prima facie case of discrimination, a plaintiff must show (1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *See id*. The Second Circuit has emphasized that the

"burden of establishing a *prima facie* case is *de minimis*."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (collecting cases).

If a plaintiff successfully presents a prima facie case of discrimination, the burden shifts to the defendant to proffer legitimate, non-discriminatory reasons for the adverse employment action.  *See id.* at 468–69.  The defendant's burden at this stage is "light."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  This burden "is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

The next step of the analysis for discrimination claims differs under Title VII and the ADEA.  Under Title VII, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer took the adverse employment action motivated "in whole or in part" by discrimination.  *Holcomb*, 521 F.3d at 137 (citation and emphasis omitted).  In other words, Title VII permits a mixed-motives analysis whereby a plaintiff, to prevail, need not prove "that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors."  *Id.* at 138 (internal quotation marks omitted); *see also* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.").

Under the ADEA, on the other hand, the Supreme Court has made clear that a mixed-motives analysis for age discrimination claims is improper.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir.

2010) ("*Gross* . . . eliminate[ed] the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases."). Rather, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross*, 557 U.S. at 177–78. This "is not equivalent to a requirement that age was the employer[']s *only* consideration, but rather that the adverse employment action *would not have occurred without it*." *Delaney*, 766 F.3d at 169 (citation omitted).[7]

Retaliation claims under Title VII, the ADEA, and the NYSHRL are also analyzed under the *McDonnell Douglas* burden-shifting test. *Gorzynski*, 596 F.3d at 110; *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). A plaintiff may establish a prima facie case of retaliation by showing: "(1) that she participated in a protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between her engaging in the protected activity and the adverse employment action." *Gorzynski*, 596 F.3d at 110. The burden then shifts to the defendant "to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa*, 708 F.3d at 125. If the defendant meets this burden, "then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* (internal quotation marks omitted).

Retaliation claims under both Title VII and the ADEA require a showing that the protected activity was a "but-for" cause of the adverse employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). A plaintiff need not show that retaliation was the

---

[7] The Second Circuit has assumed that age discrimination claims under the NYSHRL are analyzed identically to claims under the ADEA, even after *Gross*. *See Gorzynski*, 596 F.3d at 106 n.6.

only cause of the employer's action; rather, a plaintiff must only show "that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). A plaintiff may establish a claim for retaliation without proving a valid discrimination complaint. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

## 2. Application

Plaintiff claims that Defendant took three separate adverse employment actions against her: (1) failing to appoint her to the acting full-time position; (2) failing to renew her part-time position; and (3) failing to appoint her to the permanent full-time position. However, it is unclear which adverse employment actions Plaintiff claims were a result of discrimination and which were a result of retaliation. Defendant assumes that Plaintiff claims all three were a result of discrimination and the last two were a result of retaliation. (*See generally* Def.'s Mem.)[8] Plaintiff's opposition discusses the first adverse employment action in the context of her discrimination claim, (Pl.'s Opp. 3–15),[9] and the second and third adverse employment actions in the context of her retaliation claim, (*id.* at 18–25).[10] I interpret Plaintiff as pressing claims for discrimination with respect to Lepera's failure to appoint her to the acting full-time position and claims for retaliation with respect to Plaintiff's termination and the search committee's failure to interview her for the permanent full-time position. I address each of those claims in turn.

---

[8] "Def.'s Mem." refers to the Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed May 8, 2017. (Doc. 40.)

[9] "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed June 8, 2017. (Doc. 43.)

[10] Specifically, the first adverse employment action is discussed under the heading "DICKINSON ESTABLISHES CLAIMS FOR AGE AND GENDER DISCRIMINATION," (Pl.'s Opp. 3), and the second and third adverse employment actions are discussed under the heading "DICKINSON ESTABLISHES A CLAIM OF RETALIATION," (*id.* at 18).

## a.  Acting Full-Time Position

Defendant does not appear to dispute, or at least concedes for the purpose of its motion, that Plaintiff has made out a prima facie case of discrimination.  (*See* Def.'s Mem. 13 n.3 (noting that "whether plaintiff has made out a prima facie case is academic").)  Defendant states that "the Court can proceed directly to the ultimate issue of whether, on the record as a whole, plaintiff can establish issues of fact that would, if resolved in his favor, carry his ultimate burden."  (*Id.*)  Similarly, Plaintiff does not appear to contend that Defendant has failed to offer legitimate, non-discriminatory reasons for taking adverse employment actions against Plaintiff.  (*See* Pl.'s Opp. 4.)  Therefore, I assume that Plaintiff has made out a prima facie case of discrimination and that Defendant has offered legitimate, non-discriminatory reasons for the adverse employment actions, and I proceed to the third step of the *McDonnell Douglas* analysis.

Defendant asserts that Plaintiff has failed to meet her burden of showing that Lepera's concerns about Plaintiff's work performance were not the real reason that Lepera decided to appoint Kisel, rather than Plaintiff, to the acting full-time position.  With regard to Plaintiff's age discrimination claim, I disagree and find that Plaintiff has met her burden.  However, I agree with Defendant that Plaintiff has failed to meet her burden with regard to sex discrimination.

Turning first to Plaintiff's age discrimination claim, Defendant argues that Lepera's selection of Kisel over Plaintiff was motivated by Plaintiff's poor work performance—and Kisel's strong work performance—rather than Plaintiff's age.  In particular, Defendant claims that:  (1) Plaintiff failed consistently to make closing statements at hearings, despite Lepera telling her that it was the Unit's policy to make closing statements at every hearing, (*see* Lepera Decl. ¶¶ 19–20; Williams Decl. ¶ 10; Colucci Decl. ¶ 8, Ex. 6);[11] (2) Plaintiff did not adequately

---

[11] "Colucci Decl." refers to the Declaration of Clement J. Colucci, filed May 8, 2017.  (Doc. 33.)

understand the specialized NYLL provisions at issue in a large portion of the Unit's practice, exemplified by an unfavorable Unemployment Insurance Appeals Board decision purportedly noting Plaintiff's inadequate presentation of the issues, (*see* Lepera Decl. ¶¶ 21–23; Williams Decl. ¶ 10; Colucci Decl. ¶ 9, Ex. 7); and (3) Plaintiff had worse file maintenance and communication practices than Kisel, (*see* Lepera Decl. ¶¶ 24–26; Williams Decl. ¶ 10; Malik Decl. ¶ 7; Colucci Decl. ¶ 10, Ex. 8). Defendant also asserts that Lepera chose Kisel over Plaintiff because Plaintiff would have had to give up her private practice to take the acting position. (*See* Lepera Decl. ¶ 29.)

Plaintiff has set forth sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that her age was the "but-for" cause of Defendant's decision not to appoint her to the acting position. As an initial matter, the primary evidentiary basis for Defendant's non-discriminatory justifications is Lepera's testimony, (*see* Lepera Decl. ¶¶ 18–26), most of which Plaintiff disputes, (*see* Dickinson Aff. ¶¶ 15–23).[12] To the extent Defendant seeks to prevail based on Lepera's word over Plaintiff's, the appropriate juncture at which to make those arguments is at trial, not summary judgment. *Brandon v. City of New York*, 705 F. Supp. 2d 261, 271 (S.D.N.Y. 2010) ("[R]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." (citation omitted)).

_____

[12] Defendant argues that Plaintiff does not dispute that Lepera had a conversation with Williams at some point before the end of the Fall 2013 semester regarding her concerns with Plaintiff's work performance. (Def.'s Reply 5; *see also* Lepera Decl. ¶¶ 34–36; Williams Decl. ¶¶ 9–11.) Plaintiff does not dispute that Lepera claims this conversation happened. (Pl.'s Counter 56.1 ¶ 13.) However, I note that the purported conversation and Lepera's hiring of Kisel appear to have occurred at around the same time. A reasonable juror could draw an inference that Kisel's hiring was Lepera's first step in getting "new blood" into the Unit. In any event, assuming the meeting with Williams happened, and construing the evidence in the light most favorable to the Plaintiff, I still find that Plaintiff has raised sufficient issues of fact for the jury.

With respect to closing statements, Plaintiff asserts that until April 2014, Lepera had never told her to make closing statements in every case.  (Dickinson Aff. ¶ 20; Dickinson Dep. 57:10-14.)[13]  The only evidence suggesting Lepera had ever told Plaintiff to do so, apart from Lepera's own testimony, is an April 4, 2014 email from Lepera to Plaintiff stating "I have told you several times that when you do hearings for the University, you must make a closing statement."  (Colucci Decl. Ex. 6.)  However, this email came after Plaintiff made a formal complaint of discrimination against Lepera on February 10, 2014, (*see* Dickinson Aff. ¶ 24, Ex. F), of which Lepera was aware when she wrote the April 4 email, (*see* Lepera Decl. ¶¶ 41–42). This undermines the probative value of the April 4 email in demonstrating that Lepera's proffered non-discriminatory reason was not pretextual.  *See DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) (noting that the pretext inquiry requires consideration of "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination"); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998) (concluding that "there is a sufficient basis for a trier of fact to doubt the persuasiveness of the [defendant's] proffered evidence" where the evidence supporting defendant's non-discriminatory justification was created by the individuals who sexually harassed plaintiff after plaintiff's sexual harassment complaint), *abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Defendant similarly offers little evidence of Plaintiff's lack of understanding of the relevant provisions of the NYLL.  Apart from Lepera's testimony on this topic, (Lepera Decl. ¶ 23), Defendant offers a March 14, 2014 decision of the Unemployment Insurance Appeal

---

[13] "Dickinson Dep." refers to the deposition of Plaintiff Joannah Dickinson on November 15, 2016, which is attached to the Colucci Declaration.  (Doc. 33-27.)

Board that purportedly highlights the deficiencies in Plaintiff's presentation of an issue related to one of the relevant provisions, (Colucci Decl. Ex. 7). As an initial matter, a decision in one matter represents scant evidence that Plaintiff lacked sufficient knowledge of the relevant provisions of the NYLL. Moreover, the decision itself does not directly fault Plaintiff's knowledge of the law, but rather points out that Plaintiff failed to question her witness on certain topics. (*Id.* at 2.) Plaintiff asserts that she did not question her witness on those topics because the witness had no first-hand knowledge of those topics, and that it was Lepera's decision to send Plaintiff into the hearing without a witness with first-hand knowledge. (Dickinson Aff. ¶ 21; Dickinson Dep. 66:8-67:11.) More importantly, however, the decision was filed on March 14, 2014, (Colucci Decl. Ex. 7)—nearly two months after Lepera selected Kisel over Plaintiff for the acting position—and there is no evidence in the record indicating that Lepera attended the hearing. It is not clear, therefore, that Plaintiff's presentation at the hearing actually factored into Lepera's decision not to appoint Plaintiff to the acting position. Without any other record evidence of Plaintiff's purported lack of understanding of the relevant laws, there is at least a genuine issue of fact on this issue, precluding summary judgment.[14]

Defendant offers slightly more evidence to support the argument that Plaintiff was not chosen for the acting position because of her sloppy file maintenance and correspondence. Apart from Lepera's testimony, (Lepera Decl. ¶¶ 24–25), Defendant points to letters written by Kisel and Plaintiff to compare the neatness and thoroughness of their work, as well as memos written to file in February, March, and April 2014 about Plaintiff's difficulties with file maintenance,

---

[14] Notably, Lepera discussed the relevant NYLL provisions with Plaintiff during Plaintiff's interview, (Lepera Decl. ¶ 11), but did not note any deficiencies in Plaintiff's understanding of those provisions at the time. Rather, Lepera was impressed with Plaintiff and selected her for the position from a group of fourteen or fifteen candidates who Lepera interviewed. (*Id.* ¶¶ 9–12.)

(Colucci Decl. Ex. 8).[15]  Again, all of these documents were created after Lepera made the decision to appoint Kisel instead of Plaintiff to the acting position and thus could not have played a role in that decision.  To the extent Defendant seeks to use them to illustrate a trend in the quality of Plaintiff's work, that is a factual issue for the jury to consider.  The memos to file were also created after Plaintiff filed her complaint against Lepera, further undermining their evidentiary value as to Lepera's motivations.  *See Quinn*, 159 F.3d at 770.

Defendant also offers the testimony of one of Plaintiff's co-workers, Maryam Malik, who states that she "generally had difficulty following up on plaintiff's work because [her] files often lacked organized information about the case's status and the work done."  (Malik Decl. ¶ 7.)  Plaintiff disputes that her files were not organized, and contends that the files to which Defendant cites were cherry-picked to suggest poor performance.  (Dickinson Aff. ¶ 22.)  As an initial matter, Malik does not state that she ever complained to Lepera about Plaintiff's purported file maintenance issues, either prior to or after Plaintiff filed her complaint against Lepera, (*see generally* Malik Decl.), and Lepera does not state that she received such complaints from Malik, (*see generally* Lepera Decl.).  Absent such testimony, there is no evidence that Malik's issues with Plaintiff's file maintenance factored into Lepera's decision.  As to whether Plaintiff's files were actually poorly organized, I leave it to the jury to determine whether to believe Lepera and Malik or Plaintiff on this issue.

Finally, Defendant also claims that Lepera did not appoint Plaintiff to the acting position because she did not want Plaintiff to have to give up her private practice.  (*See* Lepera Decl. ¶ 29.)  Apart from Lepera's testimony, there is no evidence in the record supporting that

---

[15] Lepera testified at her deposition that she wrote the memos to file.  (Dickinson Aff. Ex. V, at   If so, they suffer the same problem as the April 4 email because they were written after Plaintiff filed her formal complaint by the same person who allegedly discriminated against Plaintiff in the first place.

assertion, and Plaintiff contends that it is "disingenuous" because Plaintiff had told Lepera she would be willing to give up her private practice for a full-time position. (*See* Dickinson Aff. ¶ 16.) Defendant does not point to anything in the record that might explain why Lepera's seemingly paternalistic view with regard to Plaintiff's private practice was an appropriate basis not to consider Plaintiff for the acting position. In any event, it is the jury's duty, not mine, to evaluate the credibility of these dueling assertions.

Plaintiff also presents evidence of possibly discriminatory conduct by Lepera, some of which is undisputed and some of which is disputed. For example, Plaintiff claims that before Kisel was hired, she had a good working relationship with Lepera. (Dickinson Aff. ¶ 4.) She received only positive feedback from Lepera and understood that she would be given the full-time position based on Lepera's representations. (*Id.* ¶¶ 4–5.) Plaintiff's relationship with Lepera deteriorated once Kisel was hired. (*Id.* ¶¶ 6, 10.) Lepera stopped discussing a possible full-time position with Plaintiff and began having frequent closed-door meetings alone with Kisel. (*Id.* ¶ 10.) Defendant claims that Lepera did not have an opportunity to evaluate Plaintiff's work performance during Plaintiff's first several months on the job because the Unit was very busy. (*See* Lepera Decl. ¶ 13.) Her only sources of information about Plaintiff's performance were hearing transcripts and written opinions of the hearing officers, which were only available "a couple of months" after the hearings. (*Id.*) However, she did on occasion review Plaintiff's files. (*Id.* ¶ 14.) None of this evidence contradicts Plaintiff's assertions that she never received negative feedback from Lepera prior to Kisel's hiring or that her working relationship with Lepera changed for the worse after Kisel's hiring. While it might explain why

Lepera did not critique Plaintiff's work until after Kisel was hired,[16] that is a credibility determination that must be performed by the jury.

With regard to evidence that age played a role in Lepera's decision, Plaintiff argues that once Kisel was hired, it became clear that Lepera had a preference for him over Plaintiff, apparently due to his youth.  Plaintiff claims that Lepera "frequently" referred to Kisel as "kid," also described him as "cute," "young," and "energetic," and never heard Lepera refer to anyone else, including Plaintiff, as "kid."  (Dickinson Aff. ¶¶ 8–9.)  Lepera admits that she referred to Kisel as a "cute kid" at least once or twice, but claims that she referred to numerous people as "kid," including other staff members of various ages and her own mother.  (Lepera Decl. ¶ 44; *see also* Malik Decl. ¶¶ 3–6.)  Plaintiff also claims that Lepera told Plaintiff that she wanted "new blood" for the acting position when Plaintiff and Lepera met in January 2014, before Lepera announced that Kisel would take the acting position.  (Dickinson Aff. ¶¶ 11–12.)  Lepera disputes that this ever occurred.  (Lepera Decl. ¶ 45.)

The terms Plaintiff claims to have heard Lepera call Kisel—some of which are not disputed by Defendant—could suggest a preference for his age.  *See, e.g.*, *Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 664–65 (2d Cir. 2009) (summary order) (concluding that describing an employee as "energized" could be a euphemism for youthfulness); *Gallaway v. Curtice-Burns Foods, Inc.*, 806 F. Supp. 28, 31 (W.D.N.Y. 1992) (holding that, among other things, manager's stated desire to bring "new blood" into the company raised triable issue as to pretextual nature of plaintiff's demotion); *Ross v. Arcata Graphics Co.*, 788 F. Supp. 1298, 1307

---

[16] Plaintiff was hired in June 2013, and Kisel was hired in October 2013.  Assuming Plaintiff began conducting hearings immediately after being hired, Lepera had Plaintiff's hearing transcripts and opinions available to review for at least two months prior to Kisel's hiring.  (*See* Lepera Decl. ¶ 13 (stating that transcripts and opinions were available "a couple of months" after the hearings).)  I also note that Lepera admits reviewing Plaintiff's files before Kisel was hired, (*id.* ¶ 14), but Defendant offers no evidence of negative feedback regarding Plaintiff's poor file maintenance practices until after Kisel was hired.

(W.D.N.Y. 1992) (noting that "new blood" could be interpreted as a "metaphor[] for youth" (quoting *Nobler v. Beth Israel Med. Ctr.*, 702 F. Supp. 1023, 1029 (S.D.N.Y. 1988))). Whether Lepera called others "kid," the frequency with which she called Kisel "cute kid," whether she told Plaintiff she wanted "new blood" for the acting position, and what Lepera meant by those terms are questions for the jury and may not be resolved at this stage. *See Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (comments about age made by individuals with substantial influence over plaintiff's employment "raise[] a triable issue as to whether the articulated reasons for [plaintiff's] firing were pretextual").

Citing several cases, Defendant contends that Plaintiff cannot meet her burden on summary judgment "merely by disagreeing with her former supervisor's view of her work" and by asking the court to give the jury a chance to disbelieve Defendant's proffered evidence. (Def.'s Reply 2.)[17] However, each of the cases Defendant cites stands for the proposition that Plaintiff must offer some affirmative evidence calling into question Defendant's proffered evidence in order to get to the jury. *See, e.g., Anderson*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *Martin v. Citibank, N.A.*, 762 F.2d 212, 217–18 (2d Cir. 1985) ("If all of the witnesses deny that an event essential to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event occurred." (citation omitted)). A plaintiff's sworn testimony in a discrimination case is the type of affirmative evidence that can defeat summary judgment. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) ("There is nothing in [Federal Rule of Civil

---

[17] "Def.'s Reply" refers to the Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, filed June 22, 2017. (Doc. 47.)

Procedure 56(c)] to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against a motion for summary judgment.").  Plaintiff's detailed affirmation, therefore, is sufficient to create genuine disputes of material fact.

Defendant argues that, in analyzing the evidence, I should adopt three inferences that counteract an inference of discrimination.  (Def.'s Mem. 14–16.)  Defendant contends that because (1) Lepera and Plaintiff are members of the same protected class (middle-aged women); (2) Lepera is the same individual who hired and fired Plaintiff; and (3) Lepera replaced Plaintiff with a member of the same protected class, there are "weighty legal presumptions" that favor a finding that Lepera was not motivated by discrimination.[18]  (Def.'s Reply 4.)  Although a jury may consider the rationales underpinning these inferences at trial, I find that a reasonable jury could still conclude age to have been the but-for cause of Defendant's failure to appoint Plaintiff to the acting full-time position.

The first inference suggests that a member of a protected class is less likely to discriminate against another member of that protected class.  *See Inguanzo v. Hous. & Servs., Inc.*, No. 12-CV-8212 (ER), 2014 WL 4678254, at *18 (S.D.N.Y. Sept. 19, 2014) ("[C]ourts recognize that an allegation that a decision was motivated by a discriminatory animus is weakened when a decisionmaker is a member of the same protected class as the plaintiff."), *aff'd*, 621 F. App'x 91 (2d Cir. 2015).  However, the Supreme Court and the Second Circuit have each held that such evidence does not create a conclusive presumption or eliminate the existence of an inference of discrimination.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[W]e have rejected any conclusive presumption that an employer will not

---

[18] Although Defendant makes this argument in the context of Lepera's decision not to reappoint Plaintiff to her part-time position, it does not appear that Plaintiff presses a discrimination claim in relation to that adverse employment decision, as discussed above.  However, the first two inferences are equally applicable to the decision not to appoint Plaintiff to the acting full-time position, and I thus address them in that context.

discriminate against members of his own race."); *Feingold v. New York*, 366 F.3d 138, 155 (2d Cir. 2004) ("We also reject the district court's suggestion that an inference of discrimination cannot be drawn because [plaintiff] was fired by [a member of his religion].").  Therefore, I find the fact that Lepera and Plaintiff are close in age does not sufficiently negate the existence of genuine issues of fact related to the inference of discrimination so as to warrant summary judgment, particularly where Plaintiff has presented evidence suggesting Lepera's preference for a younger employee, Kisel, over Plaintiff.

The second inference weighs against a finding of discriminatory motive "when the person who made the [adverse employment] decision . . . was the same person who made the decision to hire."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  "This is especially so when the [adverse employment decision] has occurred only a short time after the hiring."  *Id.*  Here, Lepera hired Plaintiff and decided not to appoint her to the acting position within the span of approximately seven months.  Plaintiff contends that Kisel's hiring altered the circumstances of Plaintiff's employment such that the inference is not applicable.  (Pl.'s Mem. 10.)  I find that a jury could reasonably conclude that Kisel's hiring sufficiently changed the "circumstances of [Plaintiff's] employment," undermining the application of the inference.  *Feingold*, 366 F.3d at 155 ("[Plaintiff's] complaints of discrimination could be found to have altered the circumstances of his employment."); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000) (holding that the "inference alone cannot support summary judgment in this case where circumstances could have changed over the course of time").

The third inference holds that a discriminatory motive is less likely where the plaintiff is replaced with someone in the same protected class.  *See Montanile v. Nat'l Broad. Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same

protected class weighs heavily against the inference that she suffered discrimination."), *aff'd*, 57 F. App'x 27 (2d Cir. 2003).  This inference is not relevant to the decision not to appoint Plaintiff to the acting full-time position.  Here, Lepera terminated Plaintiff and replaced her with a woman who was older than Plaintiff several months after Lepera decided not to appoint Plaintiff to the acting full-time position.  (Lepera Decl. ¶ 53.)  Who took Plaintiff's part-time position is not sufficiently probative to negate the inference that Lepera was motivated by discriminatory animus when she selected Kisel over Plaintiff for the acting position.

In any event, the focus of the inquiry remains on whether Plaintiff "lost out because of [her] age."  *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out *because of his age*.").  In particular, "where a replacement within the protected class follows a complaint of discrimination, such timing can support rather than undermine an inference of discrimination."  *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 27 (E.D.N.Y. 2015).  Here, the termination of Plaintiff's employment came just months after her discrimination complaint.  A reasonable jury could conclude that her termination was driven by discrimination and that replacement with an individual in the same protected class was an attempt at "concealing [Defendant's] prior discrimination."  *Holcomb*, 521 F.3d at 143.

Because I find that a reasonable jury could conclude by a preponderance of the evidence that age was the "but-for" cause of Lepera's decision to appoint Kisel, rather than Plaintiff, to the acting position, summary judgment on this issue is denied.

Plaintiff's sex discrimination claim, on the other hand, cannot survive.  Plaintiff offers no evidence of how sex factored into Lepera's decision to appoint Kisel rather than Plaintiff to the acting position.  The only comment Lepera made that could plausibly be related to sex was

calling Kisel "cute." However, Plaintiff disclaims any characterization of Lepera's relationship with Kisel as sexual or romantic. (Pl.'s Opp. 5.) Therefore, even under the mixed-motives framework applicable for Title VII claims, Plaintiff has failed to meet her burden of showing that a reasonable jury could rule in her favor on her sex discrimination claim.

b. Part-Time Position

Plaintiff appears to assert only a claim for retaliation with respect to Lepera's decision not to renew her part-time position. Defendant does not dispute that Plaintiff engaged in a protected activity by filing a formal discrimination complaint or that Plaintiff suffered an adverse employment action by not being reappointed to her part-time position. Rather, Defendant contends that the termination of Plaintiff's employment was not causally related to her discrimination complaint. (Def.'s Mem. 17–18.)

Plaintiff has established a prima facie case of retaliation based on the temporal proximity of her termination to Lepera's discovery of Plaintiff's protected activity. Lepera discovered that Plaintiff filed a discrimination complaint against her in or around late February 2014. (*See* Lepera Decl. ¶ 41.) Lepera terminated Plaintiff's employment on April 21, 2014. (Dickinson Aff. ¶ 34.)[19] Defendant acknowledges that an inference of retaliatory motive is plausible where the temporal proximity is two months. (Def.'s Mem. 17.) Here, the short time between the protected activity and adverse employment action is sufficient to establish a prima facie case.

Defendant argues that while a short temporal proximity is enough to establish a prima facie case, it is not enough, on its own, to defeat a summary judgment motion. (*Id.* at 17–18.) However, as discussed above, Plaintiff has demonstrated that there are genuine issues of fact

---

[19] The Dickinson Affidavit states that the termination of Plaintiff's employment occurred on April 21, 2015, but given the undisputed timeline of events, I understand that to be a typo.

with respect to Defendant's non-discriminatory reasons for terminating Plaintiff's employment. Therefore, Plaintiff does not rely solely on temporal proximity, but rather has raised a triable issue of whether Defendant's non-discriminatory reasons were pretextual, which is sufficient to survive summary judgment.

Defendant argues that "it is undisputed that plaintiff's continued employment was already on shaky ground before her protected activity," and citing Plaintiff's deposition, Defendant claims that Lepera had told Plaintiff "that she was unhappy with [Plaintiff's] work as early as December 2013." (Def.'s Mem. 17.) Plaintiff acknowledges that Lepera raised the subject of closing statements with Plaintiff in December 2013. (Dickinson Decl. ¶ 20.) However, Plaintiff claims Lepera never told her she was obligated to make a closing statement in every case until the April 2014 email—after Lepera became aware of Plaintiff's filing of a discrimination complaint. (*Id.*) A conversation about closing statements in December 2013 does not make the assertion that "plaintiff's continued employment was already on shaky ground before her protected activity," (Def.'s Mem. 17), an undisputed fact. Defendant also argues that because Lepera informed Williams at a meeting in January 2014 about her concerns with Plaintiff's work—before Plaintiff's protected activity—Lepera's decision not to reappoint Plaintiff in April 2014 was not motivated by retaliatory animus. (*Id.*) However, this does not defeat the genuine issues of fact raised by Plaintiff with respect to Lepera's proffered justifications. Therefore, Plaintiff's retaliation claim survives Defendant's motion.

c.  Permanent Full-Time Position

Defendant argues that the decision not to appoint Plaintiff to the permanent, full-time position could not have been motivated by retaliatory animus because the search committee, not Lepera, made the decision not to recommend Plaintiff to be interviewed for the position, and

there is no evidence in the record that the search committee acted in an improper fashion. (Def.'s Mem. 20–22.) Plaintiff does not dispute the evidence that the search committee acted without retaliatory animus. Rather, she contends that the "existence of the search committee is a red herring," (Pl.'s Opp. 23), and argues that Lepera orchestrated a plan to ensure that Plaintiff would not be recommended by the search committee to Lepera, (*id.* at 23–25).

Plaintiff fails to offer a specific theory under which an employer may be held liable when the individuals making the adverse employment decision were not the individuals harboring the alleged bias. Defendant contends that the only theory Plaintiff may proceed under is a "cat's paw" theory, whereby liability may attach to an employer when a non-decisionmaker "performs an act motivated by [discriminatory] animus that is *intended* by the [non-decisionmaker] to cause an adverse employment action, and . . . that act is a proximate cause of the ultimate employment action."[20] *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). Indeed, the Second Circuit has held that "a Title VII plaintiff is entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the process." *Holcomb*, 521 F.3d at 143 (internal quotation marks omitted).

Defendant argues that Plaintiff's claim fails because there is no evidence that Lepera specifically intended to cause Plaintiff not to be recommended by the search committee. (Def.'s Mem. 21–22.) As the Supreme Court described, "intent" in this context "denotes that the actor desires to cause consequences of his act, or that he believes that the consequences are

---

[20] Although the Second Circuit has never formally applied the "cat's paw" theory of discrimination to a claim under the ADEA, other courts have done so. *See, e.g.*, *Marcus v. PQ Corp.*, 458 F. App'x 207, 212 (3d Cir. 2012) ("We do not understand *Staub* to bar the application of a cat's paw theory in an ADEA case."); *Herbert v. Nat'l Amusements, Inc.*, No. 3:08cv1945 (VLB), 2012 WL 201758, at *3 (D. Conn. Jan. 23, 2012). Moreover, because *Straub* articulated the theory under general principles of agency and tort law, *see Straub*, 562 U.S. at 418, I see no reason why it should not be applied to claims under the ADEA.

substantially certain to result from it." *Staub*, 562 U.S. at 421 n.3 (quoting Restatement (Second) Torts § 8A). Here, for the same reasons discussed above, a reasonable jury could conclude that Plaintiff's discrimination complaint was the but-for cause of Lepera's decision not to reappoint Plaintiff to the part-time position, and it is undisputed that the decision not to reappoint was the sole cause for Plaintiff not being selected for an interview by the search committee. (*See* Noel Decl. ¶¶ 9–10; Fraser Decl. ¶¶ 9–10.) It is disputed, however, whether Lepera intended to preclude Plaintiff from consideration for the full-time position by terminating her.

Although there is no direct evidence of specific retaliatory intent on Lepera's part with respect to the permanent, full-time position, a jury could reasonably infer from the circumstances at least that Lepera knew her decision not to reappoint Plaintiff would almost certainly prevent Plaintiff from obtaining the permanent full-time position. *See Staub*, 562 U.S. at 421 n.3. Lepera states that she never communicated her views about who should be appointed to the permanent full-time position to the committee, (Lepera Decl. ¶ 32), but she does not state that she never communicated to the committee that she decided not to reappoint Plaintiff. Moreover, Noel and Fraser state that they never communicated with Lepera about their deliberations and that to their knowledge, no one else on the committee did, (Noel Decl. ¶ 6; Fraser Decl. ¶ 6), but there is no indication as to how Correa—the chair of the committee who informed the other members that Lepera decided not to reappoint Plaintiff, (Noel Decl. ¶ 9; Fraser Decl. ¶ 9)—came to acquire that knowledge. This, viewed in conjunction with the fact that Lepera terminated Plaintiff 's employment just a week after Plaintiff applied to the permanent full-time position, (*see* Dickinson Dep. 83:18-84:21; Lepera Decl. ¶¶ 48–49), could lead a reasonable jury to infer that Lepera intended to prevent Plaintiff from obtaining the permanent, full-time position by not reappointing her. Because courts must take "an extra measure of caution" before dismissing

discrimination claims on summary judgment for lack of discriminatory intent, *Schiano*, 445 F.3d at 603, Plaintiff's retaliation claim with respect to the permanent full-time position survives.

### B. *Hostile Work Environment*

#### 1. Applicable Law

A plaintiff may establish a hostile work environment claim under Title VII, the ADEA, and the NYSHRL by demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gorzynski*, 596 F.3d at 102 (citation omitted). "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010). This does not require a plaintiff to show that her work environment was "unendurable or intolerable." *Feingold*, 366 F.3d at 150 (internal quotation marks omitted).

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). Plaintiff must allege that the incidents were "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Raspardo*, 770 F.3d at 114); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) ("[T]he plaintiff must show more than a few isolated incidents of racial enmity." (citation omitted)). "Incidents that are few in number and that occur over a short period of time may fail

to demonstrate a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation marks omitted). However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

A plaintiff must also plausibly allege "that the hostile work environment was caused by animus towards her as a result of her membership in a protected class." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (quoting *Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper*, 281 F.Supp.2d 689, 704 (S.D.N.Y. 2003)). "It is 'axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable . . . only when it occurs because of an employee's protected characteristic,' such as race or gender." *Lloyd v. Holder*, No. 11 Civ. 3154(AT), 2013 WL 6667531, at *11 (S.D.N.Y. Dec. 17, 2013) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

## 2. Application

Plaintiff argues that she has established a hostile work environment claim through evidence of (1) the change in her relationship with Lepera after Kisel was hired; (2) Lepera's comments about Kisel's youth; and (3) Lepera's selection of Kisel for the acting full-time position, effectively precluding Plaintiff from consideration for the permanent full-time position. (Pl.'s Opp. 16–17.) These discrete incidents are not enough—either in severity or frequency—to establish a hostile work environment. *See, e.g.*, *Littlejohn*, 795 F.3d at 321 (allegations that the employer made negative statements about the plaintiff, was impatient and used harsh tones with the plaintiff, distanced herself and declined to meet with the plaintiff, required the plaintiff to recreate work, wrongfully reprimanded the plaintiff, increased the plaintiff's schedule, and was sarcastic to the plaintiff, could not support a finding of a severe or pervasive hostile work

environment).  Plaintiff's hostile work environment claim is therefore dismissed.

**V.**     **Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN

PART and DENIED IN PART.  Specifically, Defendant's motion for summary judgment is

granted with respect to:  (1) Plaintiff's sex discrimination claims under Title VII and the

NYSHRL; and (2) Plaintiff's hostile work environment claims under Title VII, the ADEA, and

the NYSHRL.  Defendant's motion for summary judgment is denied with respect to:  (1)

Plaintiff's age discrimination claims under the ADEA and the NYSHRL; and (2) Plaintiff's

retaliation claims under Title VII, the ADEA, and the NYSHRL.  The Clerk of Court is directed

to terminate the open motion at Document 32.

In accordance with Rule 6 of my Individual Rules and Practices in Civil Cases, the

parties are instructed to submit a joint pretrial order and other required pretrial filings within

thirty (30) days of the entry of this Opinion & Order.

SO ORDERED.

Dated: September 11, 2018
       New York, New York

Vernon S. Broderick
United States District Judge